IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

<table>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>KENT CONSTRUCTION CO.,</td><td>*</td><td></td></tr>
<tr><td>Plaintiff,</td><td>*</td><td></td></tr>
<tr><td>v.</td><td>*</td><td>Case No. TJS-12-2839</td></tr>
<tr><td>GLOBAL FORCE AUCTION GROUP,</td><td>*</td><td></td></tr>
<tr><td>LLC., <em>et al.</em>,</td><td>*</td><td></td></tr>
<tr><td>Defendants.</td><td></td><td></td></tr>
</table>

\*     \*     \*     \*     \*     \*

**MEMORANDUM OPINION**

Plaintiff Kent Construction Company ("Kent") brought this action against Defendant Harry R. Ruby[1] ("Mr. Ruby") for breach of fiduciary duty (Count Six), misappropriation (Count Seven), conversion (Count Eight) and fraud (Count Nine). (ECF No. 61.) Now pending before the Court is Kent's Motion for Summary Judgment ("Motion") (ECF No. 64). Mr. Ruby opposes the Motion. (*See* ECF No. 66.) Having considered the submissions of the parties (ECF Nos. 64, 66 & 67), I find that a hearing is unnecessary. *See* Loc. R. 105.6. For the reasons set forth below, Kent's Motion (ECF No. 64) is **GRANTED IN PART** and **DENIED IN PART**.

I.    **BACKGROUND**

A.    **Kent's Allegations**

According to the Revised Second Amended Complaint (ECF No. 61), in February 2012, Kent entered into a contract with Global Force Auction Group, LLC ("Global") to auction some of Kent's personal property. (ECF NO. 61 ¶ 7.) Under the terms of the contract, Global was required to remit to Kent the proceeds of the auction, less Global's costs and commissions, within 15 business days of the conclusion of the action. (*Id.*) Kent alleges that Mr. Ruby

---

[1] Judgment has already been entered against Defendant Global Force Auction Group, LLC. (*See* ECF No. 56.)

negotiated the contract on behalf of Global. (*Id.* ¶ 8.) Mr. Ruby told Kent that Global "was a reputable and financially sound auctioneer," that Global "would hold the proceeds of the auction for Kent's benefit," and that Global would ultimately remit the auction proceeds soon after the end of the auction. (*Id.* ¶¶ 9-11.) Kent alleges that it relied on Mr. Ruby's representations and contracted with Global for its auction service. (*Id.* ¶¶ 12-13.)

Global held the auction of Kent's property on May 5, 2012. (*Id.* at 13.) Global collected payments from the purchasers who had bid on the items and "transferred titles to approximately 438 items" to the purchasers. (*Id.*) Global took its costs and commission from the proceeds of the auction and held the remainder of the proceeds in trust for Kent. (*Id.* at 15.) After the auction, however, Global failed to remit to Kent $97,946.98 of the proceeds, plus accrued interest. (*Id.* at 16.) Thereafter, Kent demanded that Global send the auction proceeds to Kent, but Mr. Ruby admitted that "Global no longer had Kent's money." (*Id.* at 17.) Mr. Ruby explained that "unforeseen circumstances" obstructed Global's ability to forward the net proceeds of the auction to Kent. (*Id.* at 18.)

In May 2014, more than two years after the auction was held, Kent learned that Mr. Ruby had made "false and fraudulent" representations regarding Global and its financial state. (*Id.* at 19.) Specifically, Kent learned from Global and Mr. Ruby's responses to interrogatories that Global had been operating at a deficit at the time that Mr. Ruby had assured Kent that Global was a "solid, financially sound company." (*Id.* at 20.) In addition, Mr. Ruby admitted that although he had promised to remit the auction proceeds held in trust for Kent within 15 days of the action, it was the practice of Global and Mr. Ruby to use the proceeds of one auction to pay off clients from previous auctions and other creditors. (*Id.*) Had Kent known that Mr. Ruby had

misrepresented Global's financial condition and its practice of handling auction proceeds, it would not have entered into the auction contract. (*Id.* at 21.)

### B.      Discovery Sanctions

On April 21, 2014, the Court granted in part and denied in part a motion (ECF No. 28) filed by Kent seeking an order compelling Defendants to "serve complete, substantive and non-evasive responses" to certain discovery requests. (ECF No. 34.) In contravention of this order, Mr. Ruby produced incomplete responses to Kent's discovery requests. (*See* ECF No. 59 at 2.) Kent filed a motion for sanctions (ECF No. 43), which the Court granted in part and denied in part. (ECF No. 59.) The Court found that the imposition of sanctions against Mr. Ruby was warranted, and awarded Kent attorney's fees in the amount of $5,687.50. (*Id.*) In addition to an award of attorney's fees to Kent, the Court imposed the following sanctions against Mr. Ruby:

> 1.      Mr. Ruby is precluded from presenting any evidence, whether in motion or at trial, disputing Kent's assertions as to the content of communications between the parties;
>
> 2.      Mr. Ruby is prohibited from making any affirmative assertions as to communications between the parties other than that there were innumerable communications, that Defendants have no record of these communications, and that, generally, they discussed the fact that the funds due from Global Force to Kent are no longer in Global Force's possession and also include the various steps taken by Global Force to satisfy its obligations to Kent;
>
> 3.      Mr. Ruby is precluded from presenting any evidence as to the specifics of such communications;
>
> 4.      Mr. Ruby is precluded from contesting the authenticity and accuracy of the contract, sale report and other documents attached to Kent's Requests for Admissions and/or produced by Kent in discovery;
>
> 5.      Mr. Ruby is precluded from contesting that remaining unpaid amount due from Defendants to Kent is $97,946.98 in principal, $19,895.95 in accrued interest as of December 31, 2013, and additional interest of $16.10 per day for each day beginning on January 1, 2014;

6.      It shall be conclusively established that during the years 2012 and 2013, Mr. Ruby transferred hundreds of thousands of dollars from Global Force to himself and his family;

7.      It shall be conclusively established that Mr. Ruby misappropriated, to his own benefit, net proceeds from the auction sale of Kent's personal property; and,

8.      It shall be conclusively established that Defendants held the net proceeds of the auction in trust for Kent, and Mr. Ruby is precluded from introducing any evidence that they did not hold the net proceeds in trust for Kent.

(*Id.* at 3-4.)

## II.      STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing predecessor to current Rule 56(a)). The burden is on the moving party to demonstrate the absence of any genuine dispute of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). If sufficient evidence exists for a reasonable jury to render a verdict in favor of the party opposing the motion, then a genuine dispute of material fact is presented and summary judgment should be denied. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, the "mere existence of a scintilla of evidence in support of the [opposing party's] position" is insufficient to defeat a motion for summary judgment. *Id.* at 252. The facts themselves, and the inferences to be drawn from the underlying facts, must be viewed in the light most favorable to the opposing party. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008). A party may not rest upon the mere allegations or denials of its pleading but instead must, by affidavit or other evidentiary showing, set out specific facts showing a genuine dispute for trial. Fed. R. Civ. P. 56(c)(1). Supporting and opposing affidavits are to be made on personal

knowledge, contain such facts as would be admissible in evidence, and show affirmatively the competence of the affiant to testify to the matters stated in the affidavit. Fed. R. Civ. P. 56(c)(4).

## III.    ANALYSIS

### A.    Choice of Law

Subject matter jurisdiction in this case is predicated on the diversity of the parties. A federal court sitting in diversity must apply the choice of law rules applicable in the forum state. *Klaxon v. Stentor Electric Mfg. Co., Inc.*, 313 U.S. 487, 496-97 (1941). In tort cases, Maryland applies the *lex loci delicti* rule. *Philip Morris, Inc. v. Angeletti*, 358 Md. 689, 744 (2000). Under that rule, the law of the place where the wrong occurs is the law that governs. Here, Kent and Mr. Ruby have not addressed the issue of which state's law should apply. Kent is incorporated and has its principal place of business in Delaware, which is also where the auction at issue in this case took place. Global Force is a Maryland limited liability company ("LLC") with its principal place of business in Maryland, which is where Mr. Ruby resides. The contract that formed the basis of the relationship between the parties stated that it is "subject, written and agreed upon under the laws of the State of Maryland." (ECF No. 64-3 at 1.) It is not clear "where the wrong occur[ed]" in this case—Maryland or Delaware. While the parties do not mention the issue of choice of law in their submissions, Kent's Motion relies exclusively upon Maryland substantive law. Accordingly, as other courts have done, I will rely upon Maryland law and presume that the law of any other jurisdiction that ought to apply is the same as Maryland law. *See Danner v. Int'l Freight Sys. of Washington, LLC*, 855 F. Supp. 2d 433, 446-47 (D. Md. 2012) (citing *Chambco, Div. of Chamberlin Waterproofing & Roofing, Inc. v. Urban Masonry Co.*, 338 Md. 417, 421 (1995).

**B.      Mr. Ruby's Individual Liability**

The parties do not dispute that "Mr. Ruby has been solely responsible for the management of Global since its founding." (ECF No. 64-9 at 2.) More specifically, the parties do not dispute that "[f]rom the time of signing the contract with [Kent] to [May 5, 2014], the only person that owned or partnered in the day-to-day activities of [Global] was Jay Ruby." (*Id.* at 4.) In addition to owning Global and running its day-to-day operations, Mr. Ruby was "the only individual with access" to Global's bank accounts at all times relevant to this case, and was "the only person authorized to write checks on behalf of Global." (*Id.* at 6.)

Under Maryland law, "corporate officers or agents are personally liable for those torts which they personally commit, or which they inspire or participate in, even though performed in the name of an artificial body." *Tedrow v. Deskin*, 265 Md. 546, 550-51 (1972). This principle also applies to members of limited liability companies. *See Allen v. Dackman*, 413 Md. 132, 153 (2010).

Here, Mr. Ruby was personally responsible for Global's acts, including the tortious acts alleged in the Revised Second Amended Complaint (ECF No. 61). He owned and controlled Global, and was aware of Global's financial condition at all times pertinent to this case. He held Kent's money in trust and used the money to pay other creditors, rather than remitting the funds to Kent as he was required to do. Accordingly, the Court finds that Mr. Ruby is personally liable for the torts committed by Global because he personally committed, participated in, and performed the tortious acts. *See, e.g., Tedrow*, 265 Md. at 550-51; *Brock Bridge Ltd. P'ship, Inc. v. Dev. Facilitators, Inc.*, 114 Md. App. 144, 166 (1997).

### C.       Breach of Fiduciary Duty and Misappropriation

In Count Six, Kent asserts a claim against Mr. Ruby for breach of fiduciary duty. (ECF

No. 61 ¶¶ 44-52.) In Count Seven, Kent asserts a claim of misappropriation against Mr. Ruby.

(*Id.* ¶¶ 53-56.) It is not clear that either of these claims are torts under Maryland law.

In *George Wasserman & Janice Wasserman Goldsten Family LLC v. Kay*, the Court of

Special Appeals observed that while "an alleged breach of fiduciary duty may give rise to a

cause of action, . . . it does not, standing alone, constitute a cause of action." 197 Md. App. 586,

631 (2011) (citing *Kann v. Kann*, 344 Md. 689 (1997) ("[T]here is no universal or omnibus tort

for the redress of breach of fiduciary duty by any and all fiduciaries.")); *see also Knight v.*

*Manufacturers & Traders Trust Co.*, No. JKB-14-1732, 2015 WL 499569, at *7 (D. Md. Feb. 4,

2015) (stating that "Maryland courts generally do not recognize breach of fiduciary duty as a

standalone tort") (internal quotation omitted); *Boiardi v. Freestate*, No. ELH-11-01676, 2013

WL 5410131, at *6 (D. Md. Sept. 25, 2013) (noting that "the post-*Kann* landscape has been a bit

muddled," but holding that under the facts of the case, "any purported breach of fiduciary duty

[did] not constitute a standalone nonduplicative cause of action") (internal quotation omitted).

Similarly, it is not clear that there is a tort of misappropriation in Maryland that would

apply in the manner that Kent has asserted it. Maryland recognizes a tort for the misappropriation

of trade secrets, but trade secrets are not at issue in this case. *See LeJeune v. Coin Acceptors,*

*Inc.*, 381 Md. 288 (2004) (discussing misappropriation under the Maryland Uniform Trade

Secrets Act, Md. Code Ann., Com. Law § 11-1201, *et seq*.); *see also* Paul Mark Sandler & James

K. Archibald, *Pleading Causes of Action in Maryland* § 4.3 (MICPEL 4th ed. 2008) (same).

Kent cites to a number of cases in support of its argument that summary judgment is

proper on these counts, (*see* ECF No. 64-1 at 16-17), but the cases do not support Kent's

arguments. The case of *Lyon v. Campbell* itself calls into question whether there is a standalone tort for a breach of fiduciary duty under Maryland law and does not address whether there is a tort of misappropriation. 120 Md. App. 412, 441 (1998) ("[T]here is no universal or omnibus tort for the redress of breach of fiduciary duty by any and all fiduciaries. This does not mean that there is no claim or cause of action available for breach of fiduciary duty. Our holding means that identifying a breach of fiduciary duty will be the beginning of the analysis, and not its conclusion." (quoting *Kann v. Kann,* 344 Md. 689, 713 (1997)). The case of *Singstack's Ex'rs v. Harding*, 4 H. & J. 186 (1816), concerns the dual role of auctioneers as the agent of the both the buyer and seller, but does not establish whether the torts of breach of fiduciary duty or misappropriation are recognized under Maryland law. The case of *McMechen v. Mayor, etc., of City of Baltimore,* 3 H. & J. 534, 1815 WL 574 (Md. 1815) concerns the authority of an auctioneer to sell items, but similarly does not address whether the torts of breach of fiduciary duty or misappropriation are recognized under Maryland law. Finally, the cases of *Buxton v. Buxton*, 363 Md. 634, 654 (2001) and *Impala Platinum Ltd. v. Impala Sales (U.S.A.), Inc.*, 283 Md. 296, 324 (1978) address the nature of fiduciary relationships in general, but not whether the breach of a fiduciary duty or a corresponding misappropriation amount to torts under Maryland law.

Because it is not clear that Maryland recognizes the tort of breach of fiduciary duty or the tort of misappropriation, the Court finds that Kent has failed to demonstrate that it is entitled to judgment as a matter of law as to these claims. Fed. R. Civ. P. 56(a). Kent's Motion is denied as to Counts Six and Seven.

### D.    Conversion

In Count Eight, Kent asserts a conversion claim against Mr. Ruby. (ECF No. 61 ¶¶ 57-59.) Unlike Kent's claims for breach of fiduciary duty and misappropriation, I find that Kent is entitled to summary judgment on Count Eight.

In Maryland, the tort of conversion has two elements:

> First, the plaintiff must prove the defendant exerted "any distinct ownership or dominion . . . over the personal property of another in denial of his right or inconsistent with it." *Darcars Motors of Silver Spring, Inc. v. Borzym,* 841 A.2d 828, 835 (Md. 2004) (quotation omitted). "This act of ownership for conversion can occur either by initially acquiring the property or by retaining it longer than the rightful possessor permits." *Id.* Second, the defendant must have "an intent to exercise dominion or control over the goods which is in fact inconsistent with the plaintiff's rights." *Id.* at 836.

*Sprint Nextel Corp. v. Simple Cell, Inc.*, No. CCB-13-617, 2013 WL 3776933, at *8 (D. Md. July 17, 2013). Ordinarily, "money, i.e., currency, is not subject to a claim of conversion unless the plaintiff seeks to recover specific segregated or identifiable funds." *Darcars Motors*, 379 Md. at 259.

Here, the contract between Global and Kent provided that Global would conduct an auction of Kent's specified assets on a specific date and time. The "advertising costs," which were budgeted to no more than $12,500.00, along with a "$5,000.00 set up fee," were to be "deducted from the gross proceeds of the auction." (ECF No. 64-3 at 1.) In addition, Kent agreed to pay Global "a commission of Seven percent (7%) of gross sales of the assets." (*Id.*) Within "fifteen business days of the conclusion of the auction," Global agreed to "deliver all records of gross sales, expenses and net receipts" to Kent. (*Id.*)

The facts underlying Kent's conversion claim are not in dispute. (*See* ECF Nos. 64-1 at 18 & 66.) Global reported that the gross sales of the auction amounted to $859,943.00. (ECF Nos. 64-2 ¶ 12 & 64-4.) From the sale proceeds, Global was permitted to deduct expenses that

amounted to $17,500.00 (comprised of the "set up fee" and marketing expenses) and its commission of $59,496.02, which resulted in a total of $772,946.98 due to Kent. (*Id.*) Global paid Kent $350,000.00, "less than one-half of the net proceeds," within 15 days of the auction. (*Id.*) Kent demanded that the remainder of the auction proceeds be paid, but Global failed to make payment in full. (*Id.*) Although Global has paid a total of $675,000.00, there is a remaining principal balance of $97,946.98, in addition to accrued interest. (*See* ECF No. 64-5.) Based on the foregoing, and considering the undisputed facts in the light most favorable to Mr. Ruby, the Court finds that Kent is entitled to summary judgment on its conversion claim.

### E.   Fraud

In Count Nine, Kent asserts a fraud claim against Mr. Ruby. (ECF No. 61 ¶¶ 60-70.) As I will explain below, I find that Kent is entitled to summary judgment on this count.

Under Maryland law, "[f]raud encompasses, among other things, theories of fraudulent misrepresentation, fraudulent concealment, and fraudulent inducement." *Sass v. Andrew*, 152 Md. App. 406, 432, 832 A.2d 247, 261 (2003) (quoting *Iverson v. Johnson Gas Appliance Co.*, 172 F.3d 524, 529 (8th Cir. 1999)). The elements of fraud are:

> (1) that the defendant made a false representation to the plaintiff, (2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth, (3) that the misrepresentation was made for the purpose of defrauding the plaintiff, (4) that the plaintiff relied on the misrepresentation and had the right to rely on it, and (5) that the plaintiff suffered compensable injury resulting from the misrepresentation.

*Steele v. Singh*, No. DKC 14-3020, 2015 WL 4430508, at *5 (D. Md. July 17, 2015) (quoting *Md. Envtl. Trust v. Gaynor*, 370 Md. 89, 97 (2002)).

As stated above, one of the sanctions imposed on Mr. Ruby for his failure to comply with the Court's orders was that he be "precluded from presenting any evidence, whether in motion or at trial, disputing Kent's assertions as to the content of the communications between the parties."

10

(ECF No. 59 at 3.) Here, Kent asserts that Mr. Ruby "represented to Kent that Global was an experienced and reputable auctioneer which was financially sound and which would hold the net proceeds [of an auction] for Kent and remit them to Kent within fifteen (15) business days of the auction." (ECF No. 64-1 at 13.) This assertion, taken together with the evidence submitted by Kent in support of its Motion (*see* ECF No. 64-2 & 64-8), is sufficient to satisfy the first element of fraud. At the time that Mr. Ruby represented that Global was "financially sound" and that it would hold the proceeds of the auction in trust for Kent, these representations were false. In fact, it "had always been Global's practice" to use the proceeds of one auction to pay "all manner of creditor, including other Global clients as well as other vendors and creditors." (ECF No. 64-10 at 7.) In addition, Global's business "suffered from . . . financial strain" at all times relevant to this case. (*Id.*)

The second element that Kent must show to prove that it is entitled to summary judgment on its fraud claim is that Mr. Ruby knew of the falsity of his representations to Kent, or that he made the statements with reckless indifference to their truth. Here, it is undisputed that Mr. Ruby was solely responsible for the operations of Global, including the management of its finances. That Mr. Ruby was in a better position than anyone to know that Global "suffered from . . . financial strain" at the time the parties entered into their contract is not in dispute. (*See* ECF No. 64-10 at 7.) Similarly, there is no dispute that Global's practice at the time the auction was held in this case was to use the proceeds of one auction to pay "all manner of creditor," rather than holding the proceeds in trust for the consignor. (*Id.*) These points are underscored by Mr. Ruby's letter to the Court dated June 5, 2015, which was submitted in response to Kent's Motion. (ECF No. 66.) In the letter, Mr. Ruby states that Global "suffered some losses through the recession and fell behind on their obligations," but nonetheless "thought that they could stay in business by

11

doing more auctions." (*Id.*) Unfortunately, Mr. Ruby states, "with the economy and failing businesses that didn't pay their obligations to [Global,] things continued to go downhill." (*Id.*)

The third element that Kent must prove is that Mr. Ruby made the false representations to Kent with the intent to defraud. Here, while recognizing that "[a] person's intention or state of mind at any particular time is difficult to prove" with direct evidence, *see Tufts v. Poore*, 219 Md. 1, 10 (1959), the evidence that Kent has presented is sufficient to show that Mr. Ruby made the false representations so that Kent would enter into a contract with Global. Mr. Ruby has failed to submit any evidence to the contrary.[2]

The fourth element that Kent is required to show is that Kent relied on Mr. Ruby's false representations. Here, Kent has provided evidence that is not disputed to show that it relied on Mr. Ruby's false statements in deciding to enter into a contract with Global. Specifically, Kent relied on Mr. Ruby's representations that Global was a financially sound company, and that it would hold the proceeds of the auction of Kent's items in trust, with the balance owed to Kent to be remitted within fifteen business days. (ECF No. 64-2 at 2.)

The fifth element that Kent must show is that Mr. Ruby's misrepresentations were the Kent's damages. Here, Kent has shown that it is entitled to damages in the amount of $97,946.98 in principal, $19,895.95 in accrued interest as of December 31, 2013, and additional interest in the amount of $16.10 per day beginning on January 1, 2014. (*See* ECF No. 64-1 at 15.) In addition, the Court has previously ordered that it be conclusively established "Mr. Ruby misappropriated, to his own benefit, net proceeds from the auction sale of Kent's personal property." (ECF No. 59 at 4.)

---

[2] Mr. Ruby's June 5, 2015 letter (ECF No. 66) tends to indicate that Mr. Ruby made the false representations to Kent in order to secure Kent's business. Mr. Ruby states that after Global fell behind on its financial obligations, he attempted to keep the company afloat "by doing more auctions," and by borrowing money from friends and relatives. (*Id.*)

Kent's assertions of fact, supported by the evidence submitted in support of Kent's Motion, are sufficient to show that Kent is entitled to judgment as a matter of law on its fraud claim. Mr. Ruby has failed to submit any evidence to refute Kent's assertions of fact, rendering the facts undisputed for the purposes of the Motion. *See* Fed. R. Civ. P 56(e)(2). Even considering the undisputed facts in the light most favorable to Mr. Ruby, Kent has shown that it is entitled to judgment as a matter of law on its fraud claim. Accordingly, Kent is entitled to summary judgment on Count Nine.

### F.    Damages

Kent has shown that its damages amount to $97,946.98 in principal, $19,895.95 in accrued interest as of December 31, 2013, and additional interest of $16.10 per day for each day beginning on January 1, 2014 through the date of this opinion. The Court has previously ordered that Mr. Ruby is precluded from contesting this calculation of damages. (*See* ECF No. 59 at 3.) The Court's calculation of the interest owed to Kent from January 1, 2014 through the date of this opinion (September 10, 2015) is $9,933.70, which is the product of 617 days multiplied by $16.10 per day.

In addition to the damages that Kent incurred as a result of Mr. Ruby's conversion and fraud, Kent also requests that the Court incorporate into any order of judgment the $5,687.50 in monetary sanctions imposed against Mr. Ruby (*see* ECF No. 59) as a result of his failure to comply with the Court's Order dated April 21, 2014 (ECF No. 34.) (*See* ECF Nos. 64-1 at 23 & 64-13 at 4.) The Court will grant Kent's request and incorporate this monetary sanction into the Order of Judgment that will issue in conjunction with this opinion.

Kent also requests an award of punitive damages in the amount of $500,000. (ECF No. 64-1 at 23.) Punitive damages are available under Maryland law in tort actions. *See Bowden v.*

*Caldor, Inc.*, 350 Md. 4, 22 (1998). Punitive damages serve to punish a defendant "for egregiously bad conduct toward the plaintiff, [and] also to deter the defendant and others contemplating similar behavior." *Id.* (internal quotation omitted). An award of punitive damages is discretionary, *Philip Morris Inc. v. Angeletti*, 358 Md. 689, 773-74 (2000), and a number of factors must be considered in determining whether an award of punitive damages is appropriate, including the minimum amount of damages that will deter the defendant and others from similar misconduct, the proportion of punitive damages to compensatory damages, and the financial circumstances of the defendant. *See HBCU Pro Football, LLC v. New Vision Sports Properties, LLC*, No. WDQ-10-0467, 2011 WL 2038512 (D. Md. May 24, 2011).

An award of punitive damages requires a finding of actual malice. Actual malice may be evidenced by "an element of aggravation, evidenced by malicious, deliberate, gross or wanton conduct [accompanying] the fraud." *Crawford v. Mindel*, 57 Md. App. 111, 126 (1984) (citing *Wedeman v. City Chevrolet Co.*, 278 Md. 524, 530-31 (1976)). In Maryland, "a person's actual knowledge that his statement is false, coupled with his intent to deceive another by means of that statement, constitute the 'actual malice' required for the availability of punitive damages." *Ellerin v. Fairfax Sav., F.S.B.*, 337 Md. 216, 240 (1995).

Punitive damages are not awarded to compensate plaintiffs, but are designed to punish wrongdoers and to provide specific and general deterrence from similar misconduct in the future. *Owens-Illinois, Inc. v. Zenobia*, 325 Md. 420, 454 (1992). In *Bowden v. Caldor, Inc.*, 350 Md. 4, 26-41 (1998), The Court of Appeals of Maryland highlighted nine factors that courts should consider in determining the amount of punitive damages that are appropriate. First, the punitive damages awarded "must not be disproportionate to the gravity of the defendant's wrong." *Id.* at 27-28 (citing *Ellerin*, 337 Md. at 242). Second, the amount of punitive damages should not be

14

disproportionate to the defendant's ability to pay. *Id.* at 28-29 ("The purpose of punitive damages is not to bankrupt or impoverish a defendant."). Third, courts must consider the deterrence value of a punitive damages award to the defendant. *Id.* at 29-30 (noting that "repeated or frequent misconduct of the same nature, misconduct of long duration, attempts to conceal or cover-up the misconduct, failure to take corrective action, and similar circumstances, support the deterrence value of a significant award"). Fourth, in some circumstances, courts should consider the maximum fine that could be imposed for comparable criminal conduct. *Id.* at 30-31. Fifth, the punitive damages award should ordinarily be similar to awards in comparable cases in the jurisdiction. *Id.* at 31-33. Sixth, evidence of other punitive damages awards against the same defendant may be considered. *Id.* at 33-34. Seventh, courts should consider whether the tortious conduct underlying the punitive damages award is "an episode that was one continuous occurrence." *Id.* at 34-36. Eighth, courts should consider the extent that the party seeking punitive damages was required to incur costs and expenses as a result of the misconduct. *Id.* at 36-37. Ninth, courts should consider the ratio of the amount of the punitive damages award "to the actual harm inflicted on the plaintiff," which is most often captured in the compensatory damages award. *Id.* at 38-40.

Kent has demonstrated that Mr. Ruby acted with actual malice and that an award of punitive damages is permitted. The Court will exercise its discretion to award punitive damages to Kent. Having considered the *Bowden* factors, the Court finds that an award of punitive damages in the amount of $50,000 is appropriate. Some of the *Bowden* factors weigh in favor of a large punitive damages award, namely that Mr. Ruby intentionally deceived Kent, resulting in a loss to Kent of more than $100,000. In addition, Mr. Ruby does not appear to comprehend the gravity of his misconduct. (*See* ECF No. 66 ("There was no fraud involved, it was just a business

that fell behind on its obligations.")) Most of the factors, however, mitigate against a large punitive damages award. While Mr. Ruby's conduct was deceitful and fraudulent, it does appear that he made some effort to repay Kent the money it was owed. He repaid more than 85% of the auction proceeds that were owed to Kent, albeit not in the time period that he had agreed to. Accepting the assertions in Mr. Ruby's June 5, 2015 letter in the light most favorable to him, Mr. Ruby will be unlikely to pay a substantial punitive damages award. He notes that he borrowed approximately $300,000 from friends and relatives, most of which has not been repaid. (ECF No. 66.) He also notes that his "house was in foreclosure until January 2015 when [he] received help from the HARP program," and that he "continue[s] to struggle [financially] every day." (*Id.*) In addition, the Court notes that Mr. Ruby has been unable to afford counsel through the summary judgment stage of this case.

An award of punitive damages in the amount of $50,000 will serve to deter Mr. Ruby from engaging in fraudulent conduct in the future. At the same time, this punitive damages award will not result in Mr. Ruby's financial ruin. This award will also partially compensate Kent for the costs and expenses that the Court presumes it has incurred, although this is not an important factor in the Court's analysis. The Court does not find that the issues of general deterrence is an important consideration in this case, but to the extent that future persons in a position similar to Mr. Ruby become aware of the judgment in this case, this amount of punitive damages will deter them from engaging in similar misconduct. The other factors set forth by the court in *Bowden* are of little assistance to the Court's analysis.

In summary, the Court will award damages to Kent and against Mr. Ruby as follows: compensatory damages in the amount of $97,946.98 in principal, $19,895.95 in accrued interest as of December 31, 2013, $9,933.70 in interest for the period of January 1, 2014 through

September 10, 2015; monetary sanctions in the amount of $5,687.50; and punitive damages in the amount of $50,000. The total amount of damages awarded to Kent and against Mr. Ruby is $183,464.13.

## IV.    CONCLUSION

Kent's Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**. By separate Order, the Clerk of Court will be directed to enter summary judgment in favor of Kent as to Count Eight (Conversion) and Count Nine (Fraud), and to award damages as outlined in this opinion.

Given that Mr. Ruby never filed a motion for summary judgment, Count Six (Breach of Fiduciary Duty) and Count Seven (Misappropriation) remain pending against him. The Court intends to enter summary judgment *sua sponte* in Mr. Ruby's favor with regard to these counts based on the reasoning set forth in this opinion. *See MEE Direct LLC v. Tran Source Logistics, Inc.*, No. JKB-13-0455, 2014 WL 585637, at *8 (D. Md. Feb. 14, 2014). Any party may file papers in opposition to summary judgment on Counts Six and Seven by September 18, 2015. Any replies must be filed by September 25, 2015.


September 10, 2015                                    _____/s/_____
Date                                                 Timothy J. Sullivan
                                                     United States Magistrate Judge

17